# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**EDDIE LAMBERT**                                      **CIVIL ACTION**

**VERSUS**                                              **NO. 12-2717**

**N. BURL CAIN, WARDEN**                               **SECTION "E"(2)**
**LOUISIANA STATE PENITENTIARY**


## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. § 2254(e)(2).[1] For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.      FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Eddie Lambert, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  On January 27, 2005, Lambert was indicted by a grand jury in Orleans Parish for the simple burglary of an inhabited dwelling owned by Aaron Washington and one count for the aggravated rape of A.B.[3]  The Louisiana Fourth Circuit Court of Appeal summarized the facts of the case as determined at trial as follows:

> In December 2004, the victim, A.B., was living with her common law husband/boyfriend, Aaron Washington, and their three children on the corner of North Galvez and Columbus Streets in New Orleans.  At that time, they had been living in New Orleans for only a couple of months.  A.B., who did not have a driver's license, routinely walked a few times a day to a nearby liquor and convenience store, the Joe Hobbs Store.  On the night of December 4, 2004, A.B. was walking to the Job [sic] Hobbs Store to purchase beer when Mr. Lambert confronted her.  He was carrying in his hand, and swinging around, the metal part of a broken umbrella.  He stepped in front of A.B. and told her that Mr. Washington had accused him of breaking into their home.  A.B. replied: "I don't know anything about that, I wasn't there."  He responded: "No, that's alright.  I'm going to get him back some kind of way."  A.B. then attempted to get around Mr. Lambert in order to walk away.  At that point, two unidentified males, who were both wearing black t-shirts and jeans, grabbed A.B. from behind by her jacket.  The two men dragged A.B. for about a block, and Mr. Lambert walked in front of them.  A.B. screamed and told them to let her go.  She also attempted to get away by tussling and pulling back.
>
> According to A.B., the men dragged her by her jacket to a vacant lot where an old house used to be located.  On the lot, which was located between two houses, there was an empty concrete slab.  The two men lifted A.B. over the concrete slab and threw her down onto her back on a grassy area apparently located in the back of the lot.  They then held her down by her shoulders.  Asked where the two males were in relation to her body, A.B. replied: "On this side and

---

[2]Rec. Doc. No. 3.

[3]The victim is referred to in the state court records as A.B. Under Louisiana law, the victim of a sex offense is identified by initials to protect her identity. La. Rev. Stat. § 46:1844(W)(3).

this side." A.B. testified that she believed Mr. Lambert was standing over her, to her side, near the bottom of her legs. A.B. further testified that Mr. Lambert told her he was going to get Mr. Washington back "some kind of way and said he was going to 'F' my brains out." Mr. Lambert then kneeled down and pulled A.B.'s pants down, as she was "trying to kick and everything," and penetrated her. He then suddenly jumped up and fled on foot with the other two males. A.B. pulled up her pants, walked home, and sat on her porch. Sometime thereafter, Mr. Washington came outside and asked her what was wrong. A.B. did not immediately inform Mr. Washington of what had occurred. She testified that he picked her up, brought her inside, and put her in bed. She stayed in bed and slept until the next day.

The following morning, Mr. Washington's mother came to the house, got A.B. out of bed, and took her to the police station. At the police station, A.B. spoke with a female and a male police officer. After taking a statement from her, the female officer, New Orleans Police Department ("NOPD") Detective Alicia Wright, took A.B. to the Medical Center of Louisiana ("Charity"). A.B. testified that the clothes she was wearing when she was examined at Charity were the same clothes that she was wearing at the time of the rape. She further testified that at the hospital they had her take off her clothes over a piece of white paper and that "grass and everything" fell on the paper from out of her hair. The only physical injury A.B. reported was scratched knuckles. She attributed the injury to trying to fight back during the attack. A.B. denied telling either the nurse or the officers that Mr. Lambert hit her with anything. In particular, she denied telling anyone that Mr. Lambert ever hit her with the broken umbrella. A.B. also denied reeking of alcohol and body odor when she first met with the police officers the day after the rape; she stated that she had just woken up.

A.B. admitted to using marijuana and powdered cocaine at a bachelorette party on December 3, 2004, the day before the rape. She testified that she rarely used powered cocaine and never used crack cocaine. A.B. admitted that she hid her cocaine usage from Mr. Washington. A.B. testified that her last consensual sexual encounter before the rape was a few days earlier and that it was with Mr. Washington. A.B., who at the time of trial was forty-one years old, testified that she had never cheated on Mr. Washington. A.B[.] had been with Mr. Washington for about twenty years. She also testified that she has tattoos and birthmarks.

A.B. testified that she remembered she was raped on a Sunday, December 4, 2004, because she had been to a second-line parade that day. When confronted with a 2004 calendar that established December 4, 2004, was a Saturday, A.B. acknowledged that she might have been mistaken and that the second-line parade might have occurred on a Saturday. A.B. also acknowledged that she drank four sixteen-ounce beers while at the second line parade about four hours before the rape occurred.

3

A.B. testified that she saw Mr. Lambert every day because he hung around a Vietnamese store located a block away from her house that she went to regularly. According to A.B., the only time she conversed with him was when he passed by her house; if he said hello, she would say hello. She denied being friends with Mr. Lambert. She further denied ever using drugs either with, or in the presence of, Mr. Lambert. She still further denied ever seeing Mr. Lambert use drugs. Finally, she denied ever having consensual sex with Mr. Lambert.

Detective Wright, who was assigned to the NOPD Sex Crimes Unit, investigated the rape. On December 5, 2004, she first met with A.B., who arrived at 6:00 a.m. and was accompanied by her "mother." According to Detective Wright, A.B. exhibited a strong aroma of alcohol when she first met with her. Detective Wright's impression was that A.B. had been out all night in the streets. A.B. reported that she had been raped the previous day, December 4, 2004, and that the person who raped her was the same person who had broken into her boyfriend's house. Detective Wright looked into that matter and discovered that Mr. Lambert had been arrested for that burglary offense. Detective Wright then obtained a search warrant and took a DNA swab from Mr. Lambert. She also compiled a photographic lineup containing Mr. Lambert's photograph. A.B. positively identified Mr. Lambert from the lineup. Detective Wright recalled A.B. stating that a metal pipe from a broken umbrella was involved in the crime.

According to Detective Wright, A.B.'s version of the incident was as follows:

"She told me she was walking to the store on St. Bernard when she was approached by Mr. Eddie. She said she only knew Mr. Eddie from the neighborhood. She stated he walked over across the street to where she was, stood in front of her and told her that her boyfriend was down bad for putting a knife to his throat, referring to an incident that occurred previously. She then stated she told him, I don't know nothing about that and continued to try to walk.

At that time, she said that Mr. Lambert raised up a 'lil pipe from behind his back as if he was going to hit her, but he didn't hit her. Two guys then grabbed her and drug her over to a grassy area in, I believe, the 2400 block of Columbus."

A.B. further reported that when she started screaming Mr. Lambert hit her across her back with the pipe from the umbrella frame. A.B. still further reported that she went home after the rape and went to sleep. A.B. told Detective Wright that she did not tell her boyfriend, Mr. Washington, about the rape until the next day. Detective Wright testified that she did not hear A.B. complain of pain or see any wounds or bruises on A.B.'s body. She, however, admitted that she did not see A.B.'s entire body.

Betty Jo Mitchell, a forensic nurse and sexual assault nurse examiner at Charity, was qualified as an expert in forensic examination. On December 5, 2004, Ms. Mitchell triaged A.B. and performed a forensic sexual assault

4

examination on her.  Ms. Mitchell noted in A.B.'s chart that when she first arrived in the exam room she found A.B. in a fetal position and rather labile.  Ms. Mitchell translated this to mean that A.B. was balled up, crunched over, did not want to be bothered, and was not saying much of anything.  A.B. gave a history of drinking beer every day and using cocaine and marijuana.  Blood tests were positive for the presence of marijuana and cocaine.  A.B. also reported that she drank four sixteen-ounce beers between noon and 5:00 p.m. on the day of the incident.

According to Ms. Mitchell, A.B.'s account of the incident was that she was walking to a store from her boyfriend's home at approximately 11:00 p.m. on the night of December 4, 2004.  She was approached by "Ed", who questioned her about her boyfriend and another incident.  She attempted to walk away, but Ed and two other males grabbed her from behind and pulled her into a vacant lot at North Tonti and Columbus Streets, where Ed raped her as the other two males held her down.  A.B. also reported that she felt threatened because "[t]he two guys held her down and the assailant [(Ed)] had a broken umbrella to hit her."  Ms. Mitchell, however, testified that her records did not reflect that A.B. said she was ever hit with an umbrella pipe.

According to Ms. Mitchell, the only physical injury A.B. complained of was "right hand pain and a right hand that was swollen with difficulty and pain on movement."  An x-ray was taken of A.B.'s hand and confirmed she had only an abrasion.  Ms. Mitchell testified that A.B. told her that the injury was from scrambling and trying to defend herself during the incident; however, Ms. Mitchell admitted during cross examination that she just assumed A.B.'s hand injury occurred in that manner.

Ms. Mitchell testified that A.B. "had her debris collection done" - A.B. disrobed while standing on a white piece of paper so as to collect any debris.  Ms. Mitchell, however, did not testify that any debris, such as dirt or grass, was collected on the paper.  There were no stains on A.B.'s panties or body, which Ms. Mitchell examined using a Woods Lamp.  Fingernail scrapings, head and pubic hair combings, and a DNA sample were collected from A.B.  Nothing out of the ordinary was found while doing a vaginal swab.  According to Ms. Mitchell's notes, there were no tears, bruising, abrasions, redness or swelling in A.B.'s vulva, vagina or cervix.  There were no tears in her rectum.  Ms. Mitchell testified that A.B. reported having consensual sex two days before the incident.  Ms. Mitchell replied in the negative when asked whether the lack of bruising indicated consensual sex.

New Orleans Crime Laboratory Criminalist Jennifer Schroeder was qualified by stipulation as an expert in the analysis and testing of DNA, and it was stipulated that she tested a sample - presumably from the vaginal swab taken from A.B. - that matched Mr. Lambert's DNA.  Ms. Schroeder stated that the test

indicated that there had been sexual intercourse; however, she acknowledged that the test did not exclude consensual sex.

Mr. Lambert testified in his own defense. According to Mr. Lambert, he knew A.B. through her common law husband, Mr. Washington. Mr. Lambert testified that he used to sell crack cocaine on the corner of Laharpe and Galvez and that one of his customers was Mr. Washington. After learning that Mr. Washington lived near him, Mr. Lambert asked him if he could come to his house to get loaded. Mr. Lambert testified that this was the first time he went to Mr. Washington's house. On that occasion, A.B. and a neighbor were there, and they all smoked crack together.

Mr. Lambert testified that he went to Mr. Washington's residence a second time on December 1, 2004. On that date, Mr. Lambert saw A.B. in the neighborhood and asked her if Mr. Washington was home. She replied that he was not home. Mr. Lambert then offered A.B. crack cocaine in exchange for a place to get loaded and sex. Mr. Lambert testified that he and A.B. arrived at the house at 3:00 or 4:00 p.m. They smoked one rock of crack while sitting on the bed. Approximately three minutes later they had sex, which took approximately two minutes. He gave A.B. two rocks of crack, and she smoked them. He did not leave then because he was loaded. He had taken off his shoes, pants, and boxer shorts to have sex, and he was wearing only socks and a shirt. Mr. Lambert testified that when Mr. Washington came home at approximately 5:00 p.m. that day, he found Mr. Lambert and A.B. inside the house naked. Mr. Washington grabbed a knife and Mr. Lambert's jacket. As Mr. Lambert was hurriedly dressing, Mr. Washington went outside and told a neighbor to call the police because Mr. Lambert had broken into his house. According to Mr. Lambert, when the police arrived Mr. Washington had the knife to his neck and was holding his jacket; A.B. was standing in the front doorway wearing only a t-shirt. Mr. Lambert testified that although the police attempted to arrest him, he fought them and fled.

Three days later, on December 4, 2004, Mr. Lambert testified that he was sitting on his porch at 2335 Columbus Street when he saw A.B. walking down the street. She told him she wanted to get loaded. At that time, Mr. Lambert confronted A.B. regarding Mr. Washington's accusing him of breaking into his house. A.B. replied that it was Mr. Washington and not her that did so. Mr. Lambert said he was not going to deal with her, but she pleaded. He gave her three rocks of crack, and she smoked them in between two houses. A.B. then pulled her pants down to her knees, and he had intercourse with her from behind, as she was holding onto the wall of a house. Asked if A.B. hurt her hand during this time, Mr. Lambert replied that she mentioned something to him about getting into a fight with Mr. Washington. Asked if anyone else was present, Mr. Lambert said that they were alone outside between the two houses and denied, contrary to A.B.'s testimony, that two other men were present. After having sex, A.B. asked

for more crack.  Mr. Lambert refused, and A.B. left mad.  Mr. Lambert said this was the last time he saw A.B.

Mr. Lambert testified that he had consensual sex with A.B. another time before December 1, 2004.  On that prior occasion, he testified that he and A.B. stayed in a room at the Rainbow Hotel for an hour and a half, and they smoked crack cocaine and had sex.  Mr. Lambert described A.B. as his "'lil strawberry," which he defined to mean that she was "like a regular woman I like to trick with." Mr. Lambert was unaware of whether A.B. had any tattoos or birthmarks.

Mr. Lambert admitted that he was both a user and a seller of crack cocaine, but he denied being a rapist.  He testified that he would never rape a woman, that he had a mother, a daughter and seven sisters, and he would never want anyone to rape them.  He also admitted prior convictions for soliciting for prostitution and picking up a woman and for possession of sixty-five rocks of crack cocaine.  Mr. Lambert testified that he had been tried for the burglary of Mr. Washington's residence and was found not guilty.  Mr. Lambert confirmed that his own testimony at the prior burglary trial was substantially similar to his testimony at the rape trial.

Mr. Washington, who testified only as rebuttal witness for the State, denied ever having seen Mr. Lambert having sex with A.B.; denied ever seeing Mr. Lambert naked in his house; and denied ever smoking crack cocaine with anyone, including Mr. Lambert.  Mr. Washington testified that he had no convictions for any crimes and had never been arrested for a crack cocaine offense.  He admitted smoking marijuana with A.B.  He also admitted not knowing that A.B. used cocaine until this incident.  Mr. Washington testified that if he knew that A.B. was a "strawberry" - a woman that has been out in the streets selling her body for cocaine - she would not be his wife.  Mr. Lambert testified that he did not have any reason to believe that A.B. was doing anything of that nature.  He testified that A.B. had a birthmark by her lower back, one almost to her buttocks, and one on the bottom of her leg.

NOPD Officer Bryan Mulvey testified on rebuttal that on December 1, 2004, when he and his partner arrived at the scene of an alleged burglary, he observed one male (Mr. Washington) holding another male (later identified as Mr. Lambert) at knifepoint.  The male with the knife (Mr. Washington) was holding Mr. Lambert's jacket.  Officer Mulvey denied seeing anyone standing in front of the doorway and testified that the front door was closed.

State v. Lambert, 977 So.2d 313 (La. App. 4th Cir. 2008) (Table); State v. Lambert, No.

2007-KA-0974, 2008 WL 8922325, at *1-6 (La. App. 4th Cir. Mar. 12, 2008); State

Record Volume 3 of 9, Louisiana Fourth Circuit Court of Appeal Opinion, 2007-KA-0974, pp. 2-12, November 15, 2011.

After severance of the counts,[4] Lambert was tried before a jury for the simple burglary charge on November 27 and 28, 2006, and was found <u>not</u> guilty.[5] Two months later, on January 31 through February 2, 2007, he was tried before another jury for the aggravated rape charge, and was found guilty as charged.[6]

The state trial court denied Lambert's motions for a new trial or for post-verdict judgment of acquittal at a hearing on June 26, 2007.[7] The court thereafter sentenced him to serve life in prison without benefit of parole, probation or suspension of sentence.

Lambert's conviction and sentence were affirmed on direct appeal by the Louisiana Fourth Circuit on March 12, 2008, when the court found no merit in his claim

---

[4]State v. Lambert, 943 So.2d 1056 (La. 2006); St. Rec. Vol. 2 of 9, La. S. Ct. Order, 2006-KK-2788, 11/28/06; La. S. Ct. Writ Application, 06-KK-2788, 11/28/06; 4th Cir. Order, 2006-K-1460, 11/9/06; 4th Cir. Writ Application, 2006-K-1460, 11/8/06; St. Rec. Vol. 1 of 9, Minute Entry, 11/8/06.

[5]St. Rec. Vol. 1 of 9, Trial Minutes (count 1), 11/27/06; Trial Minutes (count 1), 11/28/06; Jury Verdict (count 1), 11/28/06.

[6]St. Rec. Vol. 1 of 9, Trial Minutes (count 2), 1/31/07; Trial Minutes (count 2), 2/1/07; St. Rec. Vol. 4 of 9, Trial Transcript (volume 1), 1/31/07-2/2/07; St. Rec. Vol. 5 of 9, Trial Transcript (volume 2), p. 307, 1/31/07-2/2/07.

[7]St. Rec. Vol. 1 of 9, Sentencing Minutes, 6/26/07; Motion for New Trial and/or Post-Verdict Judgment of Acquittal, 6/19/07; St. Rec. Vol. 4 of 9, Sentencing Transcript, pp. 16-17, 6/26/07.

of insufficient evidence to support the verdict.[8]  The Louisiana Supreme Court denied Lambert's subsequent writ application without stated reasons on October 31, 2008.[9]

Lambert's conviction became final 90 days later, on January 29, 2009, when he did not file a writ application with the United States Supreme Court. Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

In a letter to the clerk of the state trial court and a motion to supplement, both dated June 26, 2009, Lambert indicated that he mailed an application for post-conviction relief to the state trial court on June 23, 2009, and sought leave to supplement that application.[10]  Lambert attached an undated and unfiled copy of his application for post-conviction relief to his later-filed writ application in the Louisiana Supreme Court.[11] In its opposition memorandum, the State concedes that the application for post-conviction

---

[8]State v. Lambert, 977 So.2d at 313; State v. Lambert, 2008 WL 8922325, at *8; St. Rec. Vol. 3 of 9, 4th Cir. Opinion, 2007-KA-0974, p. 15, 11/15/11; St. Rec. Vol. 5 of 9, Appeal Brief, 2007-KA-0974, 9/17/07.

[9]State v. Lambert, 977 So.3d 313 (La. 2008); St. Rec. Vol. 6 of 9, La. S. Ct. Order, 2008-KO-0843, 10/31/08; La. S. Ct. Writ Application, 08-KO-843, 4/22/08 (dated 3/27/08); St. Rec. Vol. 3 of 9, La. S. Ct. Letter, 2008-KO-843, 4/22/08 (showing postmark 3/31/08).

[10]St. Rec. Vol. 1 of 9, Letter to Clerk of State Trial Court, 6/30/09 (dated 6/26/09); Motion to Supplement, 6/26/09.

[11]St. Rec. Vol. 8 of 9, Application for Post-Conviction Relief, undated.

9

relief was signed and mailed to the state trial court on June 23, 2009.[12]  Accordingly, I will consider that date, June 23, 2009, as the earliest date on which Lambert could have placed his application for post-conviction relief in the mail for submission to the state trial court.

In the application as supplemented, Lambert alleged that he received ineffective assistance of counsel and that the prosecutor allowed false or perjured testimony to be admitted at trial.[13]  The state trial court denied the application without stated reasons on September 15, 2011.[14] The Louisiana Fourth Circuit denied Lambert's related writ application on November 16, 2011, finding no error in the trial court's ruling.[15]  The Louisiana Supreme Court denied Lambert's subsequent writ application without stated reasons on July 27, 2012.[16]

---

[12]Rec. Doc. No. 11, p. 9.

[13]St. Rec. Vol. 8 of 9, Application for Post-Conviction Relief, undated; St. Rec. Vol. 1 of 9, Motion to Supplement (attachments), 6/26/09.

[14]St. Rec. Vol. 8 of 9, Trial Court Order, 9/15/11.

[15]St. Rec. Vol. 7 of 9, 4th Cir. Order, 2011-K-1462, 11/16/11; 4th Cir. Writ Application, 2011-K-1462, 10/19/11 (dated 10/12/11).

[16]St. Rec. Vol. 8 of 9, La. S. Ct. Order, 2011-KH-2706, 7/27/12; La. S. Ct. Writ Application, 11-KH-2706, 12/8/11 (postmarked 12/6/11, dated 12/5/11).

## II.    FEDERAL HABEAS PETITION

On February 28, 2013, the clerk of this court filed Lambert's petition for federal habeas corpus relief in which he asserted the following grounds for relief:[17] (1) The state courts' denial of relief on his claim of insufficient evidence was contrary to or involved an unreasonable application of federal law. (2) The state courts' denial of relief on his claim of ineffective assistance of trial counsel was contrary to or involved an unreasonable application of federal law. (3) The state courts' denial of relief on his claim of prosecutorial misconduct for subornation of perjury was contrary to or involved an unreasonable application of federal law.

The State filed a response in opposition to Lambert's petition, conceding timeliness and exhaustion.[18]  The State argues that Lambert's claims are without merit and that the state courts' denial of relief was not contrary to, or an unreasonable application of, federal law.

## III.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") went into effect on April 24, 1996[19] and applies to habeas petitions filed after that date.  Flanagan

---

[17]Rec. Doc. No. 3.

[18]Rec. Doc. No. 11.

[19]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir.

v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).   The AEDPA therefore applies to Lambert's petition, which, for reasons discussed below, is deemed filed in this court on November 7, 2012.[20]

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.   Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).   The State concedes and I find that Lambert's petition was timely filed, he has exhausted available state court remedies and none of the claims are in procedural default.

---

1992).

[20]The United States Court of Appeals for the Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed Lambert's petition on February 28, 2012, when the filing fee was received after denial of pauper status. Lambert's signature on the petition was dated November 7, 2012. This is also the date that the prison officials marked the pleadings as received from Lambert for e-mailing to this court.  This is the date on which he delivered the petition to prison officials for e-mailing to the court.  The fact that he later paid the filing fee does not alter the application of the federal mailbox rule to his pro se petition. See Cousin, 310 F.3d at 843 (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 374).

IV.     STANDARDS OF MERITS REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S. 849 (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210

13

F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1)

standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000);  Penry, 532 U.S. at 792-93;

Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting

Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone,

535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the

only question for a federal habeas court is whether the state court's determination is

objectively unreasonable."   Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert.

denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to

show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25);

Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

V.      SUFFICIENCY OF THE EVIDENCE (CLAIM NO. 1)

Lambert argues that the evidence was insufficient to prove an aggravated rape. As he testified at trial, he claims that A.B. had consensual sex with him in exchange for crack cocaine.  He also argues that there was no physical evidence and no eyewitnesses to support A.B.'s version of the incident.

Lambert's counsel asserted the same argument on direct appeal in the Louisiana Fourth Circuit.  Relying on state law following the holding in Jackson v. Virginia, 443 U.S. 307 (1979), the appellate court found the evidence sufficient to corroborate A.B. and to prove that the aggravated rape occurred. The Louisiana Supreme Court subsequently denied relief on these grounds without stated reasons.

Jackson supplies the appropriate United States Supreme Court standard for evaluation of a claim of insufficient evidence.  Under Jackson, this court must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.  Id., 443 U.S. at 319; Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008); Williams v. Cain, 408 F. App'x 817, 821 (5th Cir. 2011).  Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law.  Perez, 529 F.3d at 594 (citing Jackson, 443 U. S. at 324 n.16). The court's consideration of the

15

sufficiency of the evidence extends only to what was presented at trial.  See McDaniel v. Brown, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court is to consider the all of the trial evidence as a whole under Jackson); Johnson v. Cain, 347 F. App'x 89, 91 (5th Cir. 2009) (Jackson standard relies "upon the record evidence adduced at the trial.") (quoting Jackson, 443 U.S. at 324).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.  United States v. Young, 107 F. App'x 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993); see Jackson, 443 U.S. at 319 (it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").  A reviewing federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder.  Weeks v. Scott, 55 F.3d 1059, 1062 (5th Cir. 1995); Alexander v. McCotter, 775 F.2d 595, 598 (5th Cir. 1985).  Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict.  Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).  In addition, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather

16

whether it made a rational decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)).

A claim of insufficient evidence presents a mixed question of law and fact. Perez, 529 F.3d at 594; Maes v. Thomas, 46 F.3d 979, 988 (10th Cir. 1995). Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent as outlined in Jackson.

Lambert was charged with and found guilty of aggravated rape. In Louisiana, a rape is defined as "the act of anal, oral, or vaginal sexual intercourse with a . . . female person committed without the person's lawful consent." La. Rev. Stat. § 14:41(A). To constitute a rape "[e]mission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La. Rev. Stat. § 14:41(B). Rape is aggravated under La. Rev. Stat. § 14:42(A) under the following circumstances:

> Aggravated rape is a rape committed upon a person . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
> (1)   When the victim resists the act to the utmost, but whose resistance is overcome by force.
> (2)   When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

17

(3)     When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.  ...

(5)     When two or more offenders participated in the act.  ...

Under the fifth circumstance, Louisiana law defines "participate" to mean that the offender either committed the act of rape or physically assisted in the commission of the rape.  La. Rev. Stat. § 14:42(B).

Thus, to establish Lambert's guilt, the State had to prove beyond a reasonable doubt that Lambert had sexual intercourse with A.B. without her consent while A.B. was unable to resist because of the use of force or was prevented from resisting by the threat of bodily harm or that the rape occurred while Lambert was armed with a dangerous weapon or was assisted by others in perpetrating the rape.

I find that the evidence presented at trial was sufficient to establish aggravated rape. A.B. testified that Lambert, who was holding the shaft of a broken umbrella, approached her complaining about her boyfriend's accusations against him.[21]  She stated that when she tried to get away from him, two other men grabbed her from behind and dragged her to an empty lot as she screamed for help.[22]  She testified that the two men held her down on the ground as she continued to scream.[23]  She stated that Lambert told her he would get back at her boyfriend by "f-ing her brains out," pulled down her pants

---

[21]St. Rec. Vol. 4 of 9, Trial Transcript, Volume 1, pp. 100-02 (A.B.), 1/31/07-2/2/07.

[22]Id., pp. 103-05 (A.B.).

[23]Id., pp. 106-07 (A.B.).

and had intercourse with her.[24]  She recalled that Lambert suddenly stopped, and he and the other men ran off.[25]  A.B. testified that Lambert never hit her with the umbrella rod.[26] She also testified that she told police that she used marijuana and powder cocaine and that she had been drinking beer.[27]  She denied ever having used crack cocaine.[28]  She also recalled that grass fell from her clothing and hair during the medical examination.[29]

Betty Joe Mitchell, a sexual assault nurse examiner and an expert in forensic examination, found A.B. in the fetal position when she entered the examining room.[30] She did not record any external tearing or bruising during A.B.'s genital examination.[31] She also recorded only minor injuries to A.B.'s right hand.[32]  She testified, however, that the lack of bruising or tearing did not mean that there was consensual sex or that no rape

---

[24]Id., pp. 107, 118-20 (A.B.).

[25]Id., p. 120 (A.B.).

[26]Id., p. 127 (A.B.); St. Rec. Vol. 5 of 9, Trial Transcript, Volume 2, p. 197 (A.B.), 1/31/07-2/2/07.

[27]Id., p. 123-24 (A.B.).

[28]Id., p. 124 (A.B.); St. Rec. Vol. 5 of 9, Trial Transcript, Volume 2, p. 205 (A.B.), 1/31/07-2/2/07.

[29]Id., p. 127 (A.B.).

[30]Id., p. 49 (Mitchell).

[31]Id., pp. 30, 39, 44 (Mitchell).

[32]Id., p. 48 (Mitchell).

had occurred.[33]  Mitchell's report indicated that A.B. told her that Lambert had the broken umbrella but A.B. did not indicate that he actually hit her with it.[34]

Detective Alicia Wright testified that A.B. "said that Mr. Lambert raised up a 'lil pipe from behind his back as if he was going to hit her, but didn't hit her."[35]  Wright wrote in her report that A.B. said Lambert later hit her across the back with the pipe when she screamed.[36]  Wright also referred to the umbrella rod in her report as a metal pipe and that A.B. appeared at the police station with her mother, rather than her mother-in-law.[37]

The jury heard testimony that A.B.'s blood tested positive for alcohol and cocaine, and that she told Mitchell she regularly used alcohol, powder cocaine and marijuana.[38] A.B. denied having used <u>crack</u> cocaine when asked by the interviewing officer.[39]  The

---

[33]<u>Id</u>., pp. 46-48 (Mitchell).

[34]<u>Id</u>., pp. 49, 72, 75 (Mitchell).

[35]<u>Id</u>., p. 155 (Wright).

[36]<u>Id</u>., p. 156 (Wright).

[37]<u>Id</u>., pp. 139, 153 (Wright)

[38]<u>Id</u>., pp. 59-60 (Mitchell); St. Rec. Vol. 5 of 9, Trial Transcript, Volume 2, pp. 194-95 (A.B.), 1/31/07-2/2/07.

[39]St. Rec. Vol. 5 of 9, Trial Transcript, Volume 2, p. 183 (Wright), 1/31/07-2/2/07.

parties stipulated that the DNA sample taken from Lambert confirmed that he was the donor of the DNA evidence retrieved on A.B.'s vaginal swab.[40]

Lambert contends that no evidence or witnesses corroborated A.B.'s account of the incident or to rebut his contention that he periodically provided A.B. with crack cocaine in return for sex.

Although the evidence at trial presented a credibility contest, a reasonable jury could and did find from the testimony and evidence that Lambert confronted A.B. with the umbrella rod in his hand, making threats of retaliation, and with the assistance of two other men, dragged her to a lot where she was held down, while Lambert had intercourse with her without her consent.  The fact that the jury chose to believe A.B. and found her credible rather than Lambert was well within the function and discretion of the jury as factfinder.  The jury's credibility determination goes to the weight of the evidence, not its sufficiency, and is not to be disturbed on habeas review.

In addition, Louisiana law is settled that, in the absence of internal contradiction or irreconcilable conflict with the physical evidence, the testimony of the victim alone is sufficient to prove a sex offense, even where the State does not introduce medical, scientific or physical evidence of the offense.  State v. Jeter, 33 So.3d 1041, 1043 (La. App. 3d Cir. 2010); State v. Jones, 8 So.3d 845, 848-49 (La. App. 2d Cir. 2009).

_____

[40]Id., p. 94.

Contrary to Lambert's argument, A.B.'s testimony was not internally inconsistent or irreconcilable with the evidence presented.  Focusing on the points raised by Lambert, A.B. consistently reported and testified that Lambert did not hit her with the umbrella pipe.  Detective Wright, on the other hand, testified that she wrote in her report that A.B. told her that Lambert hit her across the back when she started to scream.[41]  The jury could easily have determined that Wright's report contained errors, including when she described the umbrella part as a metal pipe and recorded that A.B. appeared at the police station with her mother, rather than her mother-in-law.  Wright admitted that she wrote the report based on her notes taken during an interview conducted by another officer.  In light of these matters, a reasonable jury could easily have discounted any discrepancy between the police report and A.B.'s testimony.

In addition, A.B. did not write the police report and was not responsible for its inaccuracies.  A.B., on the other hand, consistently denied that Lambert hit her.  The jury again chose to believe A.B. on that point.

Lambert also implies that the evidence did not support A.B.'s statement that grass fell from her clothing and hair during the examination.  However, the trial transcript does not indicate that the other witnesses were specifically asked whether grass was found in A.B.'s clothing or hair.  Nurse Mitchell testified only that A.B. stripped off her clothes

---

[41]St. Rec. Vol. 5 of 9, Trial Transcript, Volume 2, p. 156 (Wright), 1/31/07-2/2/07.

while standing on a cloth that was bundled up for someone else to examine and test. She also stated that she combed A.B.'s hair and did not make note of anything in her report. Detective Wright commented that A.B. appeared as if she had been out on the streets all night. Neither comment was irreconcilable with A.B.'s testimony; instead, both were consistent with A.B.'s contention that she was wearing the same clothes she slept in from the previous night when the rape occurred.

The fact that some evidence and testimony may conflict with the evidence and testimony accepted by the jury does not render the accepted evidence insufficient to support the verdict. State v. Lilly, 111 So.3d 45, 63 (La. App. 1st Cir. 2012) ("The fact that the record contains evidence that could conflict with testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient."). In this case, the principal conflict in the testimony was between Lambert and A.B., and the jury clearly did not find Lambert credible.

A.B.'s testimony, on the other hand, clearly was found credible by the jury, and it was sufficient to prove the offense. State v. Jones, 8 So.3d at 848. Viewed in the light most favorable to the prosecution, A.B.'s testimony established that Lambert, wielding an umbrella rod and assisted by two other men, confronted A.B. and dragged her to an empty lot, where she was unable to resist the force and Lambert raped her.

Lambert has not established that the state courts' denial of relief on this issue was contrary to or an unreasonable application of Jackson. He is not entitled to relief on this claim.

VI.    PROSECUTORIAL MISCONDUCT (CLAIM NO. 3)

Lambert alleges that the prosecutor engaged in misconduct by knowingly using false or perjured testimony from A.B. to establish the aggravated rape. He claims that the prosecutor knew that the physical evidence did not support A.B.'s factual representations and failed to correct her testimony. The state courts denied relief on this claim in the post-conviction proceedings.

For purposes of federal habeas review under the AEDPA, Lambert's claim of prosecutorial misconduct in this regard presents a mixed question of law and fact. Brazley v. Cain, 35 F. App'x 390, 2002 WL 760471, at *4 n.4 (5th Cir. Apr. 16, 2002) (citing United States v. Emueqbunam, 268 F.3d 377, 403-04 (6th Cir. 2001); Jones v. Gibson, 206 F.3d 946, 958 (10th Cir. 2000); United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997); United States v. Spillone, 879 F.2d 514, 520 (9th Cir. 1989)).

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. Giglio v. United States, 405 U.S. 150 (1972); Napue v. Illinois, 360 U.S. 264 (1959); Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996). To obtain relief, the defendant must show that (1) the

testimony was actually false, (2) the State knew it was false, and (3) the testimony was material.  Duncan v. Cockrell, No. 02-20901, 2003 WL 21545926, at*3 (5th Cir. July 3, 2003); Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993).  False evidence is "material" only if there is any reasonable likelihood that it could have affected the jury's verdict.  Duncan, 2003 WL 21545926, at*3 (citing Nobles, 127 F.3d at 415).

As discussed above, Lambert has not established that A.B.'s testimony was actually false in any regard.  His argument is based on his mere conclusion that it was false, arguing that there was no corroborating physical evidence and that it conflicted with other testimony.  The mere existence of a conflict in testimony and evidence does not make it false or perjured.  See United States v. Wall, 389 F.3d 457, 473 (5th Cir. 2004), cert. denied, 544 U.S. 978 (2005) ("Wall has not established that McDowell's testimony was actually false.  He has merely shown that Ristau's testimony would establish a conflict in the testimony, a far cry from showing that it was 'actually false.'").  The evidence in this case presents nothing more than the kind of credibility conflict and dispute over the appropriate weight to be afforded to it that frequently occurs at trial and which is the jury's function to resolve.

Lambert has offered nothing to support his assertion that the State knew that A.B. did not tell the truth at trial.  Her testimony was consistent both before and during trial and would not necessarily have given the prosecutor reason to consider it false.

Lambert also has failed to establish that, even if A.B. testified falsely, the testimony affected the jury's decision in a manner violative of due process. Any inconsistency in the evidence was fully placed before the jury throughout the trial. Along with the other evidence, the jury heard the conflicts between the testimony of Lambert and A.B. and clearly found A.B. credible. The jury also heard the alleged inconsistencies between A.B.'s testimony and that of the investigating detective. Lambert's counsel focused on and highlighted these differences during his cross-examination of both A.B. and Detective Wright and in his direct questioning of Lambert.[42] The Supreme Court has stated that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). After hearing all of the testimony and reviewing the evidence, the jury resolved any conflicts in favor of the State and returned a guilty verdict. The guilty verdict itself is indicative of the credibility determinations made by the jury, and those determinations are entitled to deference on federal habeas corpus review.

For these reasons, Lambert has failed to establish that the state courts' denial of relief on this claim was contrary to or an unreasonable application of Supreme Court precedent. He is not entitled to relief on this claim.

---

[42]St. Rec. Vol. 5 of 9, Trial Transcript, Volume 2, p. 156 (Wright), p. 197 (A.B.), 1/31/07-2/2/07.

VII.    ASSISTANCE OF COUNSEL (CLAIM NO. 2)

Lambert claims that his trial counsel provided ineffective assistance when he failed to investigate and interview witnesses in preparing for trial or present any witnesses from the area where A.B. claimed the incident happened.  He also alleges that his trial counsel failed to object to the false or perjured testimony of A.B. or to the State's failure to disclose the perjury to the jury or to correct her testimony.  The state courts denied Lambert relief on this claim on post-conviction review.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Clark v. Thaler, 673 F.3d 410, 416 (5th Cir. 2012); Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010).  Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 688 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice.  Id., 466 U.S. at 697.  The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88.  Second, "[t]he defendant must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  Kimler, 167 F.3d at 893.  A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' . . . But it is not enough under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" (citation omitted) Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693); Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 792 (2011) (Strickland requires a "substantial" likelihood of a different result, not just "conceivable" one.)

On habeas review, the United States Supreme Court has recently clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms,  not whether it deviated from best practices or most common custom." Harrington, 131 S.Ct. at 788.  The Harrington Court went on to recognize the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so.  The

Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 131 S. Ct. at 788.

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1403 (2011) (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). This court must therefore apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 690; Moore v. Johnson, 194 F.3d 586, 591 (5th Cir. 1999).

Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise by the petitioner. Id., 466 U.S. at 689; Geiger v. Cain, 540 F.3d 303, 309 (5th Cir. 2008); Moore, 194 F.3d at 591. In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. Strickland, 466 U.S. at 689; Neal v. Puckett, 286 F.3d at 236-37; Clark v. Johnson, 227 F.3d 273, 282-83 (5th Cir. 2000), cert. denied, 531 U.S. 1167 (2001). Tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally

deficient performance. Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied, 528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) and Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)).

Lambert alleges that his trial counsel failed properly to investigate and prepare for trial when he failed to locate or call witnesses from the neighborhood where the rape occurred. Lambert asserts that his counsel erred in relying solely on a defense theory that A.B. was not credible. He also alleges that his counsel erred when he failed to object to A.B.'s false testimony and call witnesses to discredit her account and/or to support Lambert's version of the events.

"'A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" (emphasis added, citation omitted) Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998). A petitioner cannot show prejudice as to a claim that his counsel failed to investigate without adducing what the investigation would have shown. Diaz v. Quarterman, 239 F. App'x 886, 890 (5th Cir. 2007) (citing Strickland, 466 U.S. at 696, in recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different."). Rather, to prevail on such claim, the petitioner must provide factual support as to what exculpatory evidence further investigation would have revealed. Moawad, 143 F.3d at 948; Brown

v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Davis v. Cain, No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008) (order adopting referenced Report and Recommendation).

Lambert speculates that his counsel could have found residents in the block where the rape occurred who might have testified that they either did not see anything or that they merely saw him talking to A.B. in the street without two other men.  The record reflects that A.B. took Detective Wright to the lot where she was raped and crime lab personnel were called.[43]  Detective Wright located the owner of the property, but he was not present when the rape occurred.[44]  A.B. testified that she screamed for help during the attack and laid on the grass for some time after Lambert and the other men ran off.  There were no reports of any witnesses in the area or that anyone responded to A.B.'s calls for help.  The record does not provide any basis to assume that counsel had witnesses to pursue or another avenue to investigate, and Lambert has identified none.

In addition, Lambert has only speculated that his counsel did not look for witnesses or that a witness would have confirmed his version of the events that night.  For this reason, on federal habeas corpus review, "'[c]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial

---

[43]St. Rec. Vol. 5 of 9, Trial Transcript, Volume 2, pp. 163-64 (Wright), 1/31/07-2/2/07.

[44]Id.

31

strategy and because allegations of what a witness would have testified are largely speculative.'" Graves v. Cockrell, 351 F.3d 143, 156 (5th Cir. 2003) (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)).  In this case, Lambert has provided nothing but speculation that a favorable witness might have been found.  It is just as easy to speculate that any witness located by counsel might have confirmed that A.B. was raped after being dragged down the block.

Lambert's suggestion that counsel could have called witnesses to say they saw nothing that night could hardly be considered exculpatory.  The fact that area residents might have seen nothing does not mean that Lambert was not guilty of aggravated rape. "'Failure to present [evidence does] not constitute 'deficient' performance within the meaning of Strickland if [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise.'" (brackets in original) Williams v. Cockrell, 31 F. App'x 832, 2002 WL 180359, at *3 (5th Cir. Jan. 4, 2002) (quoting Williams v. Cain, 125 F.3d 269, 278 (5th Cir. 1997)).

Underlying Lambert's challenge to his counsel's performance is his complaint that counsel apparently was unsuccessful in his efforts to discredit A.B., to drive home the falsity of her account and convince the jury that Lambert told the true version.  In other words, Lambert faults his counsel because he was convicted.  The record is clear that counsel aggressively challenged A.B.'s testimony, her version of the incident and her

32

overall credibility.  He also made substantial effort to establish for the jury that there was a lack of physical evidence of a rape, such as bruising and other injury.

Contrary to Lambert's contention, A.B.'s purported lack of credibility was <u>not</u> the only defense presented.  As Lambert concedes, he himself testified and gave his version of the incident to the jury.  The jury clearly did not believe Lambert.  The fact that counsel's efforts to challenge A.B.'s credibility and present a valid defense through Lambert's own testimony were not successful, <u>i.e.</u> that the jury believed A.B. and not Lambert, does not mean that counsel's actions were constitutionally deficient.  <u>See</u> <u>Martinez v. Dretke</u>, 99 F. App'x 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Strickland</u>, 466 U.S. at 689 (citations omitted).  The same is true here.

Lambert reiterates in support of this claim his conclusory assertion that A.B.'s testimony was false or perjurious, but that assertion is <u>un</u>supported by the record.  Except for Lambert's self-serving testimony, which the jury rejected as not credible, there simply is no evidence that A.B.'s recitation of the events was false or contrived.  Lambert has not shown that his counsel provided constitutionally ineffective assistance before or after trial.  Accordingly, the state courts' denial of relief on this claim was not contrary to or an unreasonable application of <u>Strickland</u>. Lambert is not entitled to relief on this claim.

**RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Eddie Lambert's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[45]

New Orleans, Louisiana, this _____4th_____ day of September, 2013.


_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[45]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.